

IMPORTANT CONFIDENTIALITY AND LIMITED LIABILITY NOTICE

This email or fax and any attachments may be confidential and protected by law.  If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the email or any attachment is prohibited.  If you have received this letter in error, please notify us immediately by replying to the sender and deleting this copy and the reply from your system.

Electronic Communications Privacy Act   28 U.S.C. Sec. 2510-2521

----- Forwarded Message -----
From: Pam Rigby <prigby56@att.net>
To: "arobinsonlawfirm@yahoo.com" <arobinsonlawfirm@yahoo.com>
Sent: Thursday, July 16, 2020, 05:49:53 PM CDT
Subject: 

I was promoted and assigned to Property Crimes as an Investigator with the rank of Detective Corporal on 01/05/15. Upon assignment, I was one of two white Detectives assigned to the unit with Detective Jerry McWilliams being the other. Detective McWilliams had been assigned to the unit before me.

After the first full year in the unit and yearly felony arrest and Hinds County Grand Jury Case submissions statistics had been calculated and released to the unit Detectives by the Unit Supervisor, Sgt. Obie Wells, it was clear that myself and Detective McWilliams felony arrests and Grand Jury submissions were much higher than our co-workers.

I later learned from Detective Virgil Jarmin, who had been assigned to Property Crimes prior to Detective McWilliams and myself, that he too, had a higher felony arrest and Grand Jury submission rate than the other Detectives in the unit. Detective Jarmin, too, is a white officer. It was during this time that I began to see a pattern of racial discrimination towards white Detectives assigned to work under Sgt. Obie Wells Supervision. It became more and more clear that white Detective were being assigned cases which had suspects and / or leads which were likely to result in a solved case and a subsequent arrest that the black Detectives assigned to the Unit.

As time went on, I began documenting the number of felony arrests I which I had and subsequent Grand Jury submissions I forwarded to Hinds County DA's Office. In 2015 - total of 76 cases, 2016 - Total of 98 cases, 2017 - total of 85 cases, 2018 - total of 170 cases, 2019 - total of 114 cases and so far in 2020 - total of 41 cases.

The progression of my awareness of this racial discrimination was such that I began confronting Sgt. Wells sometime in 2018. When my concerns fell on deaf ears, I began expressing my concerns to then Commander Gator. Again, my concerns fell on deaf ears. When Commander Banks was assigned to Major Investigations, I again expressed my concerns about the unfair distribution in which Sgt. Wells assigned cases in the Unit. Again, my concerns fell on deaf ears. At one point, I complained to Cmdr. Banks about having so much work that I didn't even have time to take a lunch break while Sgt. Wells, Detective Pugh and Detective Ridgley were all out of the office for hours at a time most of the time together in the same city vehicle. Again my concerns fell on deaf ears.

Sometime through these years, I also realized that Detective McWilliams, before he retired, and I were left out of unit meeting in which Unit procedures and assignments were discussed and determined. We were later informed of any changes that were decided on without any input. Basically we were excluded from any group meetings and group input or decisions which ultimately effected us too.

1/2

Yahoo Mail - Fw  Law Suit

I also developed migraine headaches from the stress caused from the hostile work environment caused from racial discrimination and and unfair And unreasonable work load. I was first diagnosed by a professional at the Headache Center on 03/27/19. As a result of migraine headaches, I have exhausted all of my vacation and sick leave and currently use at as fast as I earn it for reoccurring migraines. I have spent hundreds of dollars out-of-pocket for physical therapy for migraine treatment and migraine medications.

The last time I went to Cmdr. Banks with concerns of unfair work assignment loads while my co-workers to include Sgt. Wells spent hours at a time five days a week out the office while I worked through the day without lunch breaks, she raised her voice and yelled down you think that I don't know what my people are doing? I have called them and meet them before to check on them, working together in the same vehicle is what works best for them'. I walked out of her office and never brought the subject up with her again. It was not until Deputy Chief Hearn learned that Sgt. Wells was spending five afternoons a week in the same vehicle with Detectives Pugh and Ridgley until the behavior stopped.

Page 1

Sent from my iPad

----- Forwarded Message -----
From: Pam Rigby <prigby56@comcast.net>
To: "arobinsonlawfirm@yahoo.com" <arobinsonlawfirm@yahoo.com>
Sent: Sunday, July 19, 2020, 10:56:14 PM CDT
Subject: ████████

This is a screen shot of a text message I received from Sgt. Obie Wells Saturday afternoon. He was instructing me to interview a suspect that had been arrested for Business Burglary. The suspect had been shot in the butt by the business owner with a shotgun and suffered a wound which could not be stitched up. UMMC released the suspect, Richard Charles Hodges, and Officer Mark Seals transported him to JPD HQ's to be booked into the City Holding Facility. I was the on-call Property Crimes Detective so I was contacted by the on-duty jail supervisor and advised that Hodges was bleeding and had soaked the back seat of Seals patrol car and Hodges was bleeding badly enough that blood was running down his leg and onto the floor. The jail supervisor stated that she was concerned that Hodges would bleed out. I told the jail supervisor to call AMR and have Hodges evaluated or take him back to the hospital. The supervisor told me that they would not be able to except Hodges into the jail bleeding like that and Hinds County would not take him either. Over an hour, maybe two went by before I received a call from Sgt. Wells, he told me that Sgt. Sonya Todd called him and wanted to know why I hadn't done anything with Hodges yet. Sgt. Wells told me to take Hodges to the interview room and interview him. I told Sgt. Wells how badly Hodges was bleeding and learned that Sgt. Sonya Todd told Officer Seals not to take Hodges back to the hospital. The jail wouldn't let him stay there so Officer Seals had Hodges sitting in his car on Congress Street for over an hour, bleeding. Sgt. Wells told me to take Hodges to the interview room and interview him. I told Sgt. Wells the facts listed above in addition to adding that Hodges had been arrested with an accomplice who had also been transported to UMMC because he was complaining of chest pain. The second suspect informed hospital staff that he had COVID-19 upon his arrival and as a result was tested. He was checked out for chest pain and any other complaints he came up with and released. Upon release, he was transported to JPD City Holding Facility, this was at least and hour or two before Hodges was released from UMMC. Upon the second suspects arrival at JPD City Jail, I received a call from the jail supervisor, she told me that they could not except him and Hinds County Jail would not take him either until his COVID-19 test results were available. This suspect had two felony warrants in Rankin County and they were willing to take him so he was released to Pearl PD with a hold placed for JPD for the charge of Business Burglary. Sgt. Wells Stated that the burglaries should have been handled by Robbery Homicide because a shooting was involved which has been standard procedure in the past. Keeping these cases together cuts down on confusion for the department and the DA's Office. Sgt. Wells told me to call the on-call homicide detective and get him to take the case back. I told him that I would rather he call a homicide Sgt. and work that out since I'm not a supervisor, Sgt. Wells would not make the call and decided that I should keep the case since I took care of the second suspect by sending him to Rankin County. I expressed my disbelief that Sgt Wells was not willing to call a Homicide Sgt about the case after he stated that it should be worked by their division, in other words, a failure to supervise, when I said that I didn't think I should be calling a homicide detective about which division should handle the case. During this discussion, Sgt. Wells hung up on me. He never

answered another call from me after that and he never responded to a text message. The next thing I heard was the referenced text message and that was over an hour after he hung up the phone on me. Notice it was also sent to Cmdr. Banks and Chief Hearn and I think a fourth person of whom I can't see. After I responded to his direction, I never got a response. So after nearly an hour, I texted him again asking for direction, again no response. After another hour or so, I called Cmdr. Banks, she told me that she understood why I didn't want to interview a bleeding suspect which was in the company of someone who was claiming to have COVID-19, (I am 60 years old with medical conditions which make me high risk), and she wasn't going to ask me to interview him. She asked me to make arrangements to have him booked into jail and ROR'ed by the on-call Municipal Court Judge. I found Hodges still in custody and back at UMMC. I coordinated JPD Officers to transport him to Hinds County Jail for Booking where an ROR had already been approved and faxed to Hinds County Booking upon release from UMMC. Cmdr. Banks stated that she, Chief Hearn and Sgt Wells had all been on the phone concerning this matter before I spoke to her, I'm not sure who's idea it was for me to interview a suspect that may have or may have been exposed to COVID-19 while bleeding all over everything he went near, but that violates policy if I'm not mistaken and probably CDC guidelines. I made Sgt. Wells aware of the situation and the suspect shouldn't have been in the building at all more less being taken into the jail and basement area a second time to interview him. There is body cam evidence and witness statements available to support the Business Burglary case and under these circumstances and interview can wait until we are sure he doesn't have COVID-19. Sgt. Wells is the Sgt. who has inflicted racial discrimination on me for over five years now. I may be wrong but I don't believe he has ever hung up on or refused to respond to anyone else he supervises and instructing me to take a suspect into HQ's and interview them with this COVID-19 issue is unbelievable not to mention the danger of contaminating Police HQ's with COVID-19.

Sent from my iPad

IMG_0632.PNG
321.8kB

2/2

2:33 PM   Sat Jul 18

# Messages

Q Search

Contacts & SMS            Unknown Senders

**Obie Wells, Cmdr Banks, Chief H... 1:53 PM**
Do you want me to get him released?

4 People >

Chris Wells
Friday 1:07 PM

Pam go downtown and try to interview the suspect in the sally port using your body camera, once complete have court services contact the on call judge and try to get him released

He has biological fluids all over him and had possibly been directly exposed to COVID-19. I am a high risk person to contract and die from COVID-19. I will have to take the write up but I am not going to get anywhere near him. I will however call a judge to have him released

Do you want me to get him released?









----- Forwarded Message -----
From: Pam Rigby <prigby56@comcast.net>
To: "arobinsonlawfirm@yahoo.com" <arobinsonlawfirm@yahoo.com>
Sent: Thursday, July 16, 2020, 06:26:23 PM CDT
Subject: 

From the time I joined the unit it was clear that Sgt. Wells didn't have control of Detective Sharon Jordan. I witnessed numerous verbal screaming matches between Detective Jordan and Detective Ridgley and Secretary Donna Simon. Detective Jordan picked on me until I verbally fought back on more than one occasion. I had no choice but to stand up for myself because it was clear that Sgt. Wells was not going to do anything about Detective Jordan's behavior towards anyone in the office. Detective Jordan continued to harass me over a number of years while Sgt. Wells stood by and witnessed the behavior without intervening. Detective Jordan is an African American female.

Sometime in 2018, Detective Jordan was assigned an Identity Theft case which was going to require a lot of work to solve but it was never the less solvable. When she found out that I had been assigned a case about 18 months prior that had the same victim and the same suspect but I was unable to obtain enough evidence to secure an arrest, she decided that I should take her case over. It was common practice to keep and work a case once it is assigned, so Detective Jordan was going against common practice by trying to get the case reassigned to me. One morning I walked into the office after being in Municipal Court for an Initial Appearance and she stopped me at the door before I could get to my desk and took me to Sgt Wells office. The Complainant / victim was sitting in Sgt. Wells office with Sgt. Wells. Detective Jordan told me to sit down and she began explaining how my case was tied to hers. Long story short, Detective Jordan began a screaming, cussing match in front of the victim and Sgt. Wells making an argument of why I should take her case. Sgt. Wells sat there and said nothing, until finally he looked at me and said 'you keep your case and he looked At Detective Jordan and said you keep your case'. Detective Jordan ignored the order and continued arguing. At this point, I looked at the victim and apologized for the unprofessional behavior in which she had witnessed and told her that I was going to take both of her cases which resulted in three separate cases consisting of, Auto Burglary, Credit Card Fraud and Identity Theft, and work them the way she deserved for them to be worked. Explaining that the citizens of Jackson deserved better than this from JPD. I worked the cases, made the arrest and got indictments on all three cases. Detective Jordan walked out of the office and told everyone that she made me take my case back, bragging about what she had done. Sgt. Wells never disciplined her for her behavior and they remain friends today eating lunch together on a regular basis.

Sometime after that incident, I learned that Detective Jordan was spreading rumors throughout the department saying that Sgt. Eneke Smith had been moved from Mobile Crime as the supervisor because she and my wife Crime Scene Investigator Mamie Barrett had been spending too much time together while at work and I was jealous so I complained and got Sgt. Smith transferred. What Detective Jordan didn't know was Eneke and Mamie and I are all close friends

1/2

and Eneke has spent many hours with her God-Daughter with our family at family gatherings and family meals and as soon as Eneke heard the rumor she told us about it. I confronted Detective Jordan in Sgt Wells office because the vicious rumors were creating a hostile work environment for both Marnie and me. Detective Jordan admitted that she started and spread the rumor and again Detective Jordan suffered no consequences for her actions.

When I confronted Sgt. Wells about his lack of supervision where Detective Jordan was concerned he told me that she was close friends with the Mayor and she had his ear and she could get him moved from Property Crimes. I told him that she was full of it and he was a fool to believe she had that kind of pull with the Mayor but he seemed to believe she did. At this point I was afraid to push to hard for fear of retaliation from Sgt. Wells and possibly the Command Staff.

When the Mayor held meeting at JPD Training Academy for the stated purpose of hearing the ranks grievances, the Mayor stated that he didn't owe anyone anything and didn't promise anyone anything when he was elected. He also promised that we could say anything we wanted in the meeting without fear of retaliation.

Page 2
Sent from my iPad

So I took advantage of the situation and said "we have a person in our office that draws you like a gun". The Mayor ignored me, so I waited and finally said, "her name is Sharon Jordan". The Mayor got visibly angry and turned around and asked one of his staff members "who is that person?". He received an answer which I was not able to hear, and he continued to ignore me and continued with the meeting. Someone in the meeting must have texted or notified Sharon Jordan what I had said, because she showed up in the meeting room as soon as the meeting ended. She went straight to the Director of Human Resources and asked how to file a complaint for someone creating a hostile work environment for her. The Director answered her questions and she went and greeted the Mayor and gave him a big hug in front of everyone present.

Within a few days I learned that Detective Jordan filed a Complaint against me for creating a hostile work environment. Deputy Chief Hearn conducted the investigation, he sent out at least two questioners to me, Sgt. Wells, Detective Pugh and Detective Ridgley. Other witnesses to incidents mentioned are Donna Simon, Virgil Jarmin, Jerry McWilliams, Officer Michael Tarrio. Deputy Chief Hearn cleared me of the allegations but didn't move either of us out of the unit. I had requested a transfer out of the unit a few months before all of this blew up, but Deputy Chief Hearn said he couldn't guarantee that I wouldn't be sent back to Patrol, so I stayed in the hostile environment in which Sgt. Wells allowed and Detective Jordan created.

During a meeting in Cmdr. Banks Office after I was cleared of the charges, Detective Jordan lost it when I was excused from a last minute schedule change because of a prior family obligation conflict. Detective Jordan went off screaming that she was passed over and the rookie Detective got the new car and now the rookie Detective is getting off for the detail and she has to work. She and Chief Hearn left the Cmdr. Banks office together and the next thing I knew Detective Jordan was transferred to Juvenile.

With Deputy Chief Hearn's assistance, my working conditions have improved drastically and are better now that they have been since I joined Property Crimes.

Every member of the Command Staff regardless of who was assigned to the positions has been fully aware of the unusually heavy work load I have had since I was assigned to Property Crimes. And regardless of how many times I asked for help insuring that Sgt. Wells assigned the case load fairly through Deputy Chief Tyrone Buckley, Commander Donald Gater, Commander Banks and not until Deputy Chief Hearn fully understood the issue has me situation

1/2

Yahoo Mail - For Law suit

improved. Each of the people listed above stood by and watched as I was discriminated against and abused by a Sgt. that clearly shows favoritism to people of his same race which is different from mine. This has occurred for over five years and being a Lesbian white female in a Police Department which has probably not employed more than ten white people at any given time during the nearly seventeen and one half years in which I have worked here, I have feared retaliation if I pushed any harder than I did to correct the problem. It was well known and in the open and no one of any rank did anything but look the other way. I am not fearful to speak out now because I am retiring on 09/26/20 and at this point I just don't care anymore. I suffer from migraine headaches with neck and back pain, sleep disorders, and chronic fatigue. I pray retirement will help with the medical issues which the poor management of the City of Jackson and the Jackson Police Department has inflicted on me of the last seventeen plus years.

Now for the non-racial discrimination issues in which I has suffered at JPD.

Page 3
Sent from my iPad

2/2

On 02/25/18, I reported to JPD HQ's, in reference to a call-out felony offense of malicious mischief. The suspect was combative and out-of-control. Corporal Tracey Hayman and Officer Stephanie Burse transported the suspect from the crime scene to HQ's at the direction of Sgt. Sam Anderson. Upon my arrival, it was clear given my training and experience, that Corporal Hayman was impaired and smelled of an intoxicating beverage. Corporal Hayman was sleeping in a chair in the booking area of the City Jail upon my arrival and fell asleep again in a chair in the Property Crimes Office once the suspect was transported upstairs for interview. Officer Burse and I took the suspect to the interview room on the 3rd floor while Corporal Hayman sleep in the Property Crimes Office. During the interview, the suspect became irate and out of control, I attempted to call Corporal Hayman on the phone for backup instead of the radio because I didn't want to escalate the situation. Corporal Hayman didn't respond to the phone, he slept through the ringing phone. I still didn't want to escalate the situation by using the radio in front of the suspect, so I left Officer Burse alone in the interview room with him and walked to the Property Crimes Office and woke Corporal Hayman up and asked for help. Hayman came to the interview room and escorted the suspect back to the jail without incident. During the interview, I asked the suspect if she had been drinking and he said 'no that's that cop your smelling'. Corporal Hayman reported for work that morning and was allowed to get in a JPD Police car and work while under the influence of an intoxicating beverage. Sgt. Anderson was on the crime scene and instructed Corporal Hayman to transport the suspect to the jail. After I reported Corporal Hayman, he was eventually taken for a breath test which I later learned was about eight hours after he had reported for work and he still registered on the intoxilyzer machine. My memo was forwarded through The proper channels and to my knowledge there was never any disciplinary for Corporal Hayman or Sgt. Anderson or anyone else who came in contact with Hayman on duty and didn't report him and get him out of the car and off duty.

Page 4
Sent from my iPad

During my time as an investigator, I have routinely been assigned cases by members of the Command Staff up to and including the Chief of Police. I have been assigned these case both through the chain of command and directly by a Command Staff Member. I have been assigned a number of high profile cases and seemingly have been the go to Detective on most occasions when a case requires special attention.

As a result, I was pressured to make an arrest of a 20 year old male for House Burglary. The suspect broke into a house on Greenbriar Street which is reportedly in the same neighborhood as Vincent Grizzel. I believe I was assigned the case for this reason, but I have no proof of this. Initially upon receiving the case, I was unable to each the complainant / victim via phone. The next day I learned that Pct 4 officer's met with the victim when they returned home from being out-of-town, after 5pm, at the residence. The victim discovered some of their belongings in the yard between their yard and the next door neighbors yard and when the looked through the wooden fence they could see some of their belongings in the backyard. They called Police. The responding Officers called Detective Pugh, the call-out Detective, and ultimately conducted a consent to search warrant at the suspect residence. The suspect wasn't present but his mother was and she signed the consent to search warrant. The mother allowed the Police to go throughout the residence to include the personal bedroom of the 20 year old suspect and the backyard but not the garage. The Officer's found evidence, property belonging to the victims in the backyard and the 20 year old bedroom. The next morning in the office I learned of the Police activity from the evening before. I immediately knew that the search of the suspects bedroom was an illegal search and told Detective Pugh so. He told me I was wrong, and I told him that since he was involved with the Officers via phone when the search occurred that he should deal with the issue. He took me to Cmdr. Banks office and we briefed her on the situation. When I told her that the search of the bedroom was illegal she told me that I was wrong and I needed to go arrest to suspect. I to.d her that I wasn't going to arrest anyone based on an illegal search which was basically a fourth amendment right violation and told her that if she didn't believe me she needed to call the DA's office and ask them if the search was legal or not. After she screamed at me for a while I went back to my office.

After a few days went by, Cmdr. Banks asked me if I had arrested that guy yet? I said not the search was illegal, and asked her if she had called the DA's office, she said no. And said I needed to get that guy arrested because the victim lives in Grizzel's neighborhood and she is being pressured. I asked her if she wanted me to win the case or just make a fast arrest and she said win. So I said than I have to work around an illegal search warrant.

1/3

I tried to find a way around the illegal search, I explored plain view By personally interviewing the officers on scene and it was a no go. So I was at a stand still again,

Cmdr. Banks was in Sgt. Wells office one morning a few days later, again she was pressuring me about an arrest. Again I brought up the illegal search, she started screaming at me saying' No and I'm no going to ' if I pay the bills and it's my house and my kid and can look anywhere I want and I can let the Police look to'. So I picked up my cell phone dialed Hinds County ADA Sue Perry put her on speaker phone and asked her about the search warrant, Sue said 'Pam we have been through this you know it's not legal' and we discussed the warrant some over speaker phone, all of this time Cmdr. Banks was screaming and walked out of the office while I was still on the phone. I hung up my cell phone and walked to my desk and called Sue back and apologized for putting her on the spot and explained why I had called her like that, she said it was okay and asked who was screaming in the back ground and I answered, "my Commander". Sue Perry was speechless. Incompetence? You tell me.

First we were pulled to work the flood, we were assigned to work patrol duties answering calls in unmarked cars with no emergency equipment, ie. blue lights, sirens, radios, other that portable radios, and no PA System at a minimum. The citizens had no way of knowing we were Police, I felt very vulnerable pulling up on crime scenes in a black Dodge Charger knowing that I could be mistaken for someone who could be considered a threat and getting shot at. We were not able to respond to calls in an emergency complicity, for instance I was dispatched to the double homicide at Baptist Hospital. When I received the call I was just leaving Pct 4 at Parkside and Old Canton Road. My response time was considerably slower because I had to drive the speed limit, stop at all red lights and stop signs, etc. two people had just been brutally gunned down in the parking lot and no one knew for sure where the shooter was, if he was still on scene or not, if anyone was still in danger or not, while I'm tooling through town responding in my unmarked car.

Then we went straight to Burglary suppression detail 6p - 2a five days a week. Again in unmarked cars. I was patrolling around a restaurant in Belhaven and was approached by a armed security guard, good thing he didn't shoot me! We were told not to approach anyone, but to keep them in sight and call a marked unit to stop and identify them. Now how do you keep someone in sight without pursuing them in an unmarked car?which is a violation of General Orders! We could keep anyone in sight long enough to get a marked unit there to stop and identify, it was a waste of time and resources. Case load stayed the same.

While we worked flood and Belhaven details the citizens of Jackson Property Crimes cases were sitting on our desks, no call backs, no time sensitive video collection, no working a case at all. No service to the victims of Property Crimes during this time! Case load stayed the same.

Then we went to Impound Lot detail 9p - 5a two days a week and at our desk 8a - 4p three days a week. This schedule created at least one 16 hour day or a double back with less than three hour off. We didn't have a bathroom available, so I took toilet paper and squatted beside my car with the doors open to hide between. Thanks God I didn't need to do more than pee while I was there. Case load stayed the same.

We have been ordered to alter our schedule, with threat of disciplinary action if we don't show, for numerous parades and other special events. We work these events for regular pay and are given alternate days off to avoid overtime. We are rarely given much of a notice and it is not always considered an excuse if you have previously made plans for what would normally be a regular day off. Case load stays the same.

We have been ordered to work weekend crime suppression details with little or no notice, again with little or no regard for any prior plans made for what would normally be a regular day off and given an alternate day off to avoid overtime. We work the details in both marked and unmarked cars. Case load stays the same.

During all of these details in which we have been pulled to work, we are doing so while working the same case load as if we were at our desks five days a week. We are being asked to work extremely short handed and being given a fraction of the normal work week to complete the work. All while work two sometime three different shift hours in the same week. We have worked without bathrooms, without adequate equipment sometimes and more often than not which the lack of can be life threatening for both Officer and citizen. Were are being forced to work these horrific schedules without overtime compensation.

Detectives that are required to work call-out schedules are doing so with no call-out pay unless you actually get called. Some Detective are working call-out using their personal cell phones because the city will not provide them with an adequate phone to use. There is no compensation for being available and on standby. Detectives don't receive additional pay for being detectives over Patrol Officers even though are jobs require more job knowledge, experience and expertise. Case load remains the same.

Page 5