NITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

MELVIN WILLIAMS, ET AL.                                                    PLAINTIFFS

V.                                                    CIVIL ACTION NO. 3:20-CV-785-DPJ-FKB

THE CITY OF JACKSON, ET AL.                                               DEFENDANTS

ORDER

Twenty-one current and former Jackson Police Department (JPD) employees have sued

the City of Jackson, Mayor Chokwe Antar Lumumba, JPD, Police Chief James Davis, and

several other JPD employees claiming Defendants violated their federal rights and committed

certain state-law torts.  There are two motions before the Court:  (1) the City of Jackson

Defendants' Motion to Sever [18] and (2) Individual Defendants' Immunity-Based Motion to

Dismiss and For Stay [20].

After expending considerable judicial resources, the Court concludes that neither motion

can be fully considered until the issues are better framed and addressed.  In broad strokes, the

causes of action are ill-defined, and the parties have not yet provided legal analysis as to the

federal claims the motion to dismiss addresses.  Similarly, the Court cannot adequately consider

the motion to sever until the Court sorts out which federal claims survive dismissal and

determines whether subject-matter jurisdiction exists as to the claims that remain.

Accordingly, the sole goal of this Order is to help the parties frame the issues.  For now,

the motions are denied without prejudice, except that the case remains stayed, and Plaintiffs are

instructed to file a *Schultea* reply to the qualified-immunity defense.[1]

---

[1] *See Schultea v. Wood*, 47 F.3d 1427, 1433 (5th Cir. 1995).

I.      Background

        Plaintiffs assert multiple federal- and state-law claims based on their experiences as JPD

officers.  In addition to suing the City of Jackson and JPD, they also sue the following city

employees, both individually and in their official capacities:  Mayor Lumumba, Police Chief

Davis, Deputy Chief Deric Hearn,[2] E. Bradley Lumumba, and Vincent Grizzell.  Compl. [1] ¶¶

1–28; *id.* at 36–38.[3]

        Plaintiffs' Complaint is 42 pages and attaches 138 pages of supporting documentation,

including affidavits from several Plaintiffs.  Some claims are unique to one or a few Plaintiffs,

whereas other claims are brought by every Plaintiff.

        After reciting the alleged facts, the Complaint offers three global counts that incorporate

all prior averments.  Count One asserts federal claims under the First, Fifth, and Fourteenth

Amendments to the United States Constitution and Title VII of the Civil Rights Act of 1964.  *Id.*

at 36.  It also mentions a litany of state claims:

> [M]ental anguish, body [sic] injuries, [f]raud, [b]reach of fiduciary duties to
> employees, misrepresentation, misuse of legal proceedings, joint tortfeasors, strict
> liability, negligent hiring, negligent retention, negligent supervision, intentional
> infliction of emotional distress, negligent infliction of emotional distress, br[e]ach
> of contract, individually [sic] and conspiracy of misappropriation of City[]
> funds[,] . . . [and] misuse of state funds . . . .

*Id.* at 36.  Count Two repeats the same list of state-law claims found in Count One.  *Id.* at 37.

Count Three asserts intentional infliction of emotional distress, which also appears in Counts

One and Two.  *Id.* at 38.  Because the counts re-allege all prior facts, it is difficult to discern

---

[2] Hearn's last name is spelled "Hearns" in the Complaint.  *But see* Defs.' Mem. [21] at 1.

[3] The Complaint uses paragraph numbers from pages 3 to 36.  The paragraph numbers begin
again on page 39, but because they are duplicative of prior paragraph numbers, the Court will
refer to all passages before page 3 and after page 36 by page number.

which facts allegedly support the federal claims or the more precise legal theories supporting those claims.[4]

This Order hopes to organize the allegations and the claims in a way the parties—and then the Court—can substantively address. Accordingly, the Court has taken an exhaustive review of both the Complaint and its attached exhibits to separate Plaintiffs' factual allegations according to what the Court perceives to be their related federal claims, to which Defendants assert qualified immunity. If the Court has misconstrued the application of the facts, Plaintiffs should address that in their *Schultea* reply, the requirements of which are discussed below. [5]

II.    Standards

A.    Motion to Dismiss

When considering a motion under Rule 12(b)(6), the "court accepts 'all well-pleaded facts as true, viewing them in the light most favorable to the plaintiff.'" *Martin K. Eby Constr. Co. v. Dall. Area Rapid Transit*, 369 F.3d 464, 467 (5th Cir. 2004) (quoting *Jones v. Greninger*, 188 F.3d 322, 324 (5th Cir. 1999) (per curiam)). But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not

---

[4] As just one example, there is an apparent claim for "nepotism by Mayor Cheowke [sic] Antar Lumuba." Compl. [1] ¶ 51. But which federal law was violated by the alleged nepotism and under what legal theory?

[5] Individual Defendants briefly argue in reply that the Court should strike Plaintiffs' Response to their motion for failure to follow Local Uniform Civil Rule 7(b)(4), which requires counsel to file both a response and a memorandum brief. Reply [27] at 2. True, Plaintiffs failed to follow that rule. But that same rule states that "[a]ny written communication with the court that is intended to be an application for relief or other action by the court must be presented by a motion in the form prescribed by this Rule." L.U. Civ. R. 7(b). Defendants violated that provision. Accordingly, the Court will not strike Plaintiffs' response and advises both parties to follow the rules in future filings.

suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

To overcome a Rule 12(b)(6) motion, a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Id*. at 555 (citations and footnote omitted). "This standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of' the necessary claims or elements." *In re S. Scrap Material Co., LLC*, 541 F.3d 584, 587 (5th Cir. 2008) (quoting *Twombly*, 550 U.S. at 556).

Here, Plaintiffs assert their federal claims under § 1983, which creates civil remedies for certain constitutional violations. Such claims require "(i) deprivation of a federal right; and (ii) action under color of state law." *Arnold v. Williams*, 979 F.3d 262, 267 (5th Cir. 2020) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)). "The doctrine of qualified immunity, however, adds a wrinkle to § 1983 pleadings when . . . relevant." *Id.* at 266–67.

B.     Qualified Immunity

Qualified immunity generally shields government officials performing discretionary functions from individual liability for civil damages. *Ramirez v. Guadarrama*, 3 F.4th 129, 133 (5th Cir. 2021) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When a defendant asserts qualified immunity, "the burden is on the plaintiff to demonstrate the inapplicability of the defense." *McClendon v. City of Columbia*, 305 F.3d 314, 323 (5th Cir. 2002). To meet that burden, a plaintiff must offer non-conclusory facts sufficient to allow a plausible inference that: "(1) the official violated a statutory or constitutional right and (2) the right was clearly

4

established at the time of the challenged conduct." *Khan v. Normand*, 683 F.3d 192, 194 (5th Cir. 2012) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

There is not, however, a heightened pleading standard when qualified immunity is asserted. *Arnold*, 979 F.3d at 267. "Section 1983 claims implicating qualified immunity are subject to the same Rule 8 pleading standard set forth in *Twombly* and *Iqbal* as all other claims." *Id.* Within those standards, "a plaintiff seeking to overcome qualified immunity must plead specific facts that both allow the court to draw the reasonable inference that the defendant is liable for the harm he has alleged and that defeat a qualified[-]immunity defense with equal specificity." *Backe v. LeBlanc*, 691 F.3d 645, 648 (5th Cir. 2012).

Conducting this inquiry here is a difficult task. Individual Defendants expressly invoked qualified immunity and correctly observed Plaintiffs' burden of showing "adequate authority at a sufficiently high level of specificity to put a reasonable official on notice that his conduct is definitively unlawful." Defs.' Mem. [21] at 6 (quoting *Vincent v. City of Sulphur*, 805 F. 3d 543, 547 (5th Cir. 2015)). Plaintiffs were required in response to show—through relevant legal authority—that the alleged acts violated clearly establish law. They, instead, highlighted the factual averments from their Complaint without offering any legal analysis of their specific federal claims or any legal authority demonstrating that the alleged acts violated clearly established law. *See Harris v. Jackson County*, 684 F. App'x 459, 462 (5th Cir. 2017) (holding that plaintiff failed to meet his burden of showing clearly established law and noting that "[i]mportantly, Harris fails to cite a single case in his appellate brief illustrating that the law is clearly established"). And because Plaintiffs never analyzed the legal basis of their federal claims, Individual Defendants replied in like generalities, addressing the alleged facts but offering little legal analysis of the precise claims—of which there are many.

5

This leaves the Court with neither a clear statement of the specific federal claims nor legal analysis of them from either side. Rather than conduct a *sua sponte* review of all claims and speculate about what the parties might say, the better course is to allow Plaintiffs another opportunity to explain why qualified immunity does not apply.

C.      *Schultea* Reply

"When the defendant asserts qualified immunity, the court can order the plaintiff to submit a reply, refuting the immunity claim 'with factual detail and particularity.'" *Johnson v. Halstead*, 916 F.3d. 410, 416 (5th Cir. 2019) (citation and quotation marks omitted). "The plaintiff's reply 'must be tailored to the assertion of qualified immunity and fairly engage its allegations.'" *Id.* (quoting *Schultea*, 47 F.3d at 1433).

Taking that approach here, this Order provides guidance regarding the reply's content and highlights certain legal questions the Court has seen in its own research. Plaintiffs are obviously not limited to those issues, but they should be addressed.

1.      The *Schultea* Reply Must Identify the Claims and Provide Non-Conclusory Facts and Case-Specific Legal Analysis

As noted above, it is the Plaintiff's burden to show that the qualified-immunity defense does not apply through non-conclusory factual averments sufficient to allow a plausible inference that: "(1) the official violated a statutory or constitutional right and (2) the right was clearly established at the time of the challenged conduct." *Khan*, 683 F.3d at 194.

In this case, that task requires: (1) identifying the specific federal claims (it is not, for example, enough to generally say Defendants violated the Fourteenth Amendment; Plaintiffs must say how); (2) identifying which Plaintiffs assert each specific federal claim and the defendants against whom they are asserted; (3) identifying the specific facts that support those separate claims; and (4) as to each specific federal claim, the legal analysis demonstrating—

through legal authority—that the alleged conduct violated Plaintiffs' rights and that those rights were clearly established at the time of the alleged violation.

Plaintiffs should note that not just any authority will do.  They must show that the legal principles they assert are based on "a sufficiently clear foundation in then[-]existing precedent." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018).  In other words, "[t]he rule must be 'settled law.'"  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 228 (1991)).  And that "means it is dictated by **controlling authority or a robust consensus of cases of persuasive authority**."  *Id.* at 589–90 (emphasis added) (citations and quotation marks omitted).

Finally, this inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  "[U]nless existing precedent 'squarely governs' the conduct at issue, an official will be entitled to qualified immunity."  *Cope v. Cogdill*, 3 F.4th 198, 204 (5th Cir. 2021) (citing *Brosseau*, 543 U.S. at 201).  Thus, "the plaintiff must 'identify[] a case in which an officer acting under similar circumstances was held to have violated the [Constitution], and . . . explain[] why the case clearly proscribed the conduct of that individual officer.'"  *Id.* (alteration in original) (quoting *Joseph v. Bartlett*, 981 F.3d 319, 345 (5th Cir. 2020)).

## 2.    The *Schultea* Reply May Not Use Collective Pleading

The reply must explain what each Individual Defendant allegedly did to support the specific claims against him.  As Individual Defendants correctly argue, the Complaint largely fails to allege "which defendant(s) are charged with" the constitutional violations Plaintiffs pleaded or "exactly what actions taken by which defendant violated a clearly established constitutional right."  Individual Defs.' Mem. [21] at 8.  Plaintiffs acknowledge that many of

their claims are asserted collectively against "all Defendants" because "**each** Defendant" violated the asserted rights as to "**each** Plaintiff."  *See, e.g.*, Pls.' Mem. [24] at 5 (emphasis in original).

But such pleading is insufficient, especially with this many Plaintiffs and divergent claims.  *Id.* at 4.  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's *own individual actions*, has violated the Constitution."  *Iqbal*, 556 U.S. at 676 (emphasis added).  And, under Rule 8, that means they must offer non-conclusory factual averments showing what those defendants supposedly did so the Court can determine whether those facts state plausible claims against each defendant that are not barred by qualified immunity.  *Id.*

Absent that level of specificity, the Complaint resembles a "[q]uintessential' shotgun pleading[]" because it "fail[s] to distinguish between the actions of named defendants."  *Sahlein v. Red Oak Capital, Inc.*, No. 3:13-CV-00067-DMB-JM, 2014 WL 3046477, at *3 (N.D. Miss. July 3, 2014) (quoting *Magluta v. Samples*, 256 F.3d 1282, 1284 (11th Cir. 2001)).  "This Court has repeatedly warned attorneys against such pleading practices" because they violate Federal Rule of Civil Procedure 8(a)(2).  *Payne v. Univ. of S. Miss.*, No. 1:12-CV-41-KS-MTP, 2015 WL 1482636, at *4 (S.D. Miss. Mar. 31, 2015) (collecting cases); *see also Rush v. STIHL, Inc.*, No. 3:17-CV-915-DPJ-FKB, 2020 WL 1276103, at *7 (S.D. Miss. Mar. 17, 2020) (same).

III.    Federal-Law Claims

Before concluding that a *Schultea* reply is necessary, the Court endeavored to identify the more precise federal claims and determine whether the rights were clearly established.  Through that process, the Court identified certain factual and legal issues that will need to be addressed.  While it is not the Court's responsibility to issue spot for the parties, it seems prudent to mention issues that both sides will ultimately need to address.  This is not intended to be an exhaustive

list—the parties should address all relevant legal issues—but these are the claims that seem apparent and some questions the Court has regarding them.

> A.      First Amendment Claims

>> 1.      Free-Speech Claims

According to the Complaint, Davis distributed a Code of Ethics throughout JPD requiring that officers keep secret "[w]hatever [they] see or hear of a confidential nature or that is confided to [them] in [their] official capacity, . . . unless revelation is necessary in the performance of [their] duty," Code [1-3]. Compl. [1] ¶ 30. Plaintiffs argue that this policy captures "information that . . . is suppose[d] to be what is known as **OPEN RECORDS** to the public," and note that they are specifically concerned about their ability to report "call out[s] for the police into the public," since "that record is public information and not being transparent could harm the public at large." *Id.*

It appears that some Plaintiffs assert their claims based on the existence of the policy itself, whereas others claim that they were disciplined for breaking it. Different tests apply to those distinct contexts. *See United States v. Nat'l Treasury Emps. Union*, 513 U.S. 454, 468 (1995) (explaining distinction). Plaintiffs will need to state which context applies to their individual claims and then evaluate them under the appropriate test.

>> 2.      Establishment-Clause Claims

Plaintiffs also say Chief Davis forced his religious beliefs on them. First, he allegedly told his officers to pray and "force[d] [them] to go to certain churches to eat a meal for free," subjecting Plaintiffs who refused to "serious inquiry as to why they are not supporting a church." Compl. [1] ¶ 32 (capitalization removed); *accord* Pl.'s Resp. [24] at 4. Second, he supposedly

violated city policy by displaying religious symbols on his uniform and wore his uniform at religious events.  Compl. [1] ¶ 32; *see* Davis Article [1-20] at 1–2.

To begin, Plaintiffs frequently plead that Defendants violated city policy.  But violating municipal policy does not equate to a constitutional violation "if constitutional minima are nevertheless met."  *Myers v. Klevenhagen*, 97 F.3d 91, 94 (5th Cir. 1996) (citations omitted).  Accordingly, Plaintiffs' *Schultea* reply should go beyond city policy and—like all other federal claims—cite binding authority, or a robust consensus of persuasive authority, reflecting their clearly established rights in this context.  *Wesby*, 138 S. Ct. at 589.

Also, "[i]f the Supreme Court's Establishment Clause cases have any enduring theme, perhaps it is that the appropriate test depends on the type of government action that is challenged."  *Woodring v. Jackson County*, 986 F.3d 979, 988 (7th Cir. 2021).  Thus, Plaintiffs will need to explain whether their claims fall under the coercion test, the endorsement test, or the *Lemon* test.  *Am. Humanist Ass'n v. McCarty*, 851 F.3d 521, 525 (5th Cir. 2017) (explaining various tests).  They must then apply the test to the specific facts related to this claim.

B.    Fifth and Fourteenth Amendment Claims

Next, every Plaintiff alleges Davis violated their due-process and equal-protection rights "around or near February or March 2020," Compl. [1] ¶ 54, when he, without a competitive hiring process, reappointed all acting sergeants, *id.* ¶ 34.  Plaintiffs say this decision contradicted city policies restricting such appointees to 120 days of service and requiring a competitive process, *id.* ¶¶ 34, 54 (citing Personnel Actions [1-6] at 2), and it thereby violated their due-process rights by depriving them of a promotion opportunity, *id.* ¶ 34.  Plaintiffs also contend these appointments violated their equal-protection rights by subjecting them to unequal treatment relative to the acting sergeants.  *Id.* ¶¶ 34, 54.

10

1.      Due-Process Claims

The first question is whether Plaintiffs can state a Fifth Amendment due-process claim absent any federal actors.  *See Jones v. City of Jackson*, 203 F.3d 875, 880 (5th Cir. 2000) ("The Fifth Amendment applies only to violations of constitutional rights by the United States or a federal actor.").

Next, under the Fourteenth Amendment, Plaintiffs must show that government "procedures . . . imperil[ed] a protected liberty or property interest."  *Johnson v. Rodriguez*, 110 F.3d 299, 308 (5th Cir. 1997).  They must identify that interest and show that it was clearly established in this context.

2.      Equal-Protection Claims

 "To state a claim under the Equal Protection Clause, a § 1983 plaintiff must either allege that (a) 'a state actor intentionally discriminated against [him or her] because of membership in a protected class,'. . . or (b) he [or she] has been 'intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment' . . . ."  *Gibson v. Tex. Dep't of Ins.*, 700 F.3d 227, 238 (5th Cir. 2012) (first quoting *Williams v. Bramer*, 180 F.3d 699, 705 (5th Cir. 1999); then quoting *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

If Plaintiffs pursue the first theory, they will need authority explaining the protected class to which they belong and why the alleged acts violated clearly established law.  If they pursue the second, then they must address *Engquist v. Oregon Department of Agriculture*, 553 U.S. 591, 605 (2008) (rejecting class-of-one equal-protection claims related to discretionary public-employment decisions).

C.      Discrimination Claims

Plaintiffs Rekasha Adams, Garry Arthur, Mamie Barrett, Amelia Bolden, Ucona Carter, Rhonda Daniels, Keith Freeman, Tammy Heard, Candice Ingram, Vanessa Johnson, Cassandra Thomas, Pamela Rigby, and Robert Watts allege various acts of discrimination.

Adams says she was excessively ridiculed and embarrassed for supposed defects with her uniform (by her supervisor, Commander Tyrone Buckley), excessively punished in response to two fatal shootings, reassigned to demoralizing positions, and verbally harassed, all as part of a "conspir[acy] by the Defendants to force her resignation." Compl. [1] ¶ 43; *accord* Adams Statements [1-11] at 12–15, 17–18 (stating Adams was moved eight times in under two years and describing her "horrible" and "demoraliz[ing]" assignment at the Animal Control Center). She alleges that this treatment was the product of gender discrimination and amounted to a hostile work environment. Adams Statements [1-11] at 13–15 ("I'm working under hostile conditions that are unjust.").

Adams also joins Boldin and Carter in alleging that they were singled out on the basis of their sex in the context of a September 2020 internal investigation concerning a leaked mugshot of another JPD officer. Compl. [1] ¶ 30; Adams Statements [1-11] at 18–19. These Plaintiffs say this investigation subjected them to a lie detector test, "threat[s of] immediate termination and reprimands, . . . harass[ment,] and humiliat[ion]." Compl. [1] ¶ 30. Carter was ultimately fired pursuant to this investigation. *Id.* ¶ 31; Termination Letter [1-5] at 1. She says, however, that this, too, was discriminatory action, as male officers accused of more severe infractions have not been subject to termination. Compl. [1] ¶ 31.

Arthur says that, since 2017, he has been subject to discriminatory treatment on account of his race. *Id.* ¶ 49. He asserts that he was forced to work in Accident Reconstruction

Investigations, even though the "horrific deaths he had seen as a reconstruction investigator" had resulted in his diagnosis with PTSD, a diagnosis the Defendants knew.  *Id.*  He claims that Defendants "refused to relocate" him "because of his race" and that he was denied access to training school, unlike at least one similarly situated Black coworker.  *Id.*  In addition to racial discrimination, Arthur also attributes his unequal treatment to his hesitancy in "chang[ing] a report to save face for the bad behavior of the chief of police and some [other] . . . black bad actors."  *Id.*

Barrett, a crime-scene investigator, says that, unlike male crime-scene investigators, she was not given hot water, water pressure, or gloves to process biohazardous material.  *Id.* ¶ 44.  She also claims that she was subject to demeaning comments by Davis:  When asked by Davis why she did not record a firearm found at the scene of a crime, Barrett explained that another officer had recovered the firearm, and that the department procedure requires the officer that recovers evidence to log that evidence.  *Id.*  Davis responded, in front of Grizzle, "[W]ell[,] I'm sorry you[']r[e] not properly trained to do your job."  *Id.*  Barrett "contends that neither those Defendants would have treated a male or yet [sic] alone a Black policeman like they treated her."[6]  *Id.*

Daniels says she was unjustifiably punished and treated disrespectfully compared to other employees because she is a lesbian.[7]  *Id.* ¶¶ 39, 40; Daniels Statement [1-9] at 4–5.  She says her supervisor, Sergeant Cedric Myles, called her six times in one day to demand she come to work

---

[6] The Complaint asks that the Court "[p]lease see Exhibit M, this Plaintiff's own words," describing one alleged incident.  Compl. [1] ¶ 44.  No Exhibit M has been filed.

[7] Daniels states that her most significant complaint relates to "The Domestic Violence situation I went through," in which she felt she was "discriminated against because of [her] sex/gender."  Daniels Statements [1-9] at 1.  But no further facts regarding that "situation" are provided.

after she advised him that she was out sick, but he did not do the same to Melvin Williams, who was also out sick the same day.  *Id.*

Daniels and Rigby both allege that, as a result of their gender, they were subjected to unsanitary and demoralizing conditions while being required to work security shifts at the City's Impound Lot.  Compl. [1] ¶¶ 36–37.  They say they were not provided access to restroom facilities, so they were "forced to use the restroom outside on the grass and rocks."  *Id.*

Freeman (who is White) contends that he was racially discriminated against when he was unable to get deferred company time, while comparable Black officers, such as Tina Wallace, were granted such time.  *Id.* ¶ 48.  He broadly alleges discriminatory treatment from 2017 through 2019, saying that this discriminatory treatment ultimately forced his resignation.  *Id.*

Heard contends that she was targeted and harassed on account of her sex and sexual orientation:  The treatment began in 2014, when Heard was accused of failing to converse with a 911 caller who ultimately "died from a bad actor[']s conduct."  *Id.* ¶ 45.  Criticism stemming from this incident emerged even though "it [was] found that [Heard] did not violate any rule with[in] JPD."  *Id.*  Regardless, "since [that accusation], Heard claims she has been further "targeted and harass[ed] to the point that" she was terminated, then rehired and forced to repeat the police-training process.  *Id.* ¶ 45.[8]

Rigby asserts discriminatory treatment she attributes to her race, gender, and sexual orientation.  *Id.* ¶ 36–40, 42; Rigby Statements [1-10] at 8–9.  Rigby argues that White officers, including herself, were given more work-intensive cases than their Black coworkers; specifically, they were assigned cases more likely to lead to an arrest (and thus entailing more

---

[8] The Complaint refers to Exhibit N as providing more information on Heard's allegations, but the Court could not find that exhibit in the record.

work), a fact she says is reflected in her solved-cases numbers, and that her status as a minority (a "Lesbian white female") made her hesitant to push back against this assignment.  Rigby Statements [1-10] at 1–2; Compl. [1] ¶ 42.  Finally, she claims the Mayor (and JPD) showed favoritism towards another employee, Officer Sharon Jordan, including by failing to punish Jordan for her offensive rumors and comments about Rigby.  Compl. ¶ 42; Rigby Statements [1-1] at 6–9.  Rigby retired from the force "due to a number of . . . discriminati[ng] acts by Chief James Davis, Deputy Chief Deric Hearn[,] and duty Chief Vincent Grizzell."  Compl. [1] ¶ 42.

Thomas alleges that she was, despite her qualifications, denied an opportunity to be a part of the JPD SWAT Team, and she attributes that denial to sex discrimination.  *Id.* ¶ 41.  The SWAT Team has been all-male since 2018.  *Id.*  Thomas avers she was ultimately forced to quit to seek employment with a non-discriminatory employer.[9]  *Id.*

Finally, Watts says that his application for reinstatement was rejected because the City discriminates against White applicants.  Compl. [1] ¶ 50; Watts Statement [1-13] at 1–2.  Watts first applied to be reinstated in March 2019, but he decided not to take the job in the midst of the application process.  Watts Statement [1-13] at 1.  After a conversation with Davis, who encouraged his reapplication, Watts again reapplied and was passed over.  *Id.*  While not totally clear, it appears that a then-pending investigation of Watts was cited as the basis for the rejection; Watts says this investigation is "false and a blatant attempt to cover up the fact they are discriminating against white applicants."  *Id.* at 1–2.  As evidence of the discriminatory hiring practices, Watts points to the fact that the City's police force is not representative of the City of Jackson: "White officers represent 4.29% of JPD.  At the time of the 2010 census, the City of

---

[9] The Complaint refers to Exhibit J as providing more information on Thomas's allegation, but Exhibit J features statements by Rigby that relate to her own experience—Thomas is not mentioned.

Jackson racial makeup was 79% black, 18% white." *Id.* at 2.  Moreover, he contends that, of the 24 officers graduating in the 58th and 59th recruitment classes, none were white.  *Id.* at 1.

As noted, the Individual Defendants seek dismissal of all claims against them, and though it has not sought dismissal, the City seeks to sever the claims.  Plaintiffs responded to both.

1.      Title VII

As described, Plaintiffs bring a variety of discrimination claims against Individual Defendants under § 1983 and apparently Title VII of the Civil Rights Act of 1964.  As an initial point, only "employers" may be held liable under Title VII.  *Ackel v. Nat'l Commc'ns, Inc.*, 339 F.3d 376, 381 n.1 (5th Cir. 2003).  So, if Plaintiffs intended to bring a Title VII claim against Individual Defendants, in their individual capacities, they will need to address how defendants can be individually liable under Title VII.

2.      Section 1983

That said, "employment discrimination claims brought under § 1983 'are analyzed under the evidentiary framework applicable to claims arising under Title VII.'"  *Stark v. Univ. of S. Miss.*, 8 F. Supp. 3d 825, 836 (S.D. Miss. 2014) (quoting *Lawrence v. Univ. of Tex. Med. Branch at Galveston*, 163 F.3d 309, 311 (5th Cir. 1999)).  Under that framework, each Plaintiff raising an individual discrimination claim will need to identify the type of discrimination and the liability theory that applies.  While the preceding facts are the Court's construction of those claims, Plaintiffs are certainly free to clarify if the Court missed something.

a.      Disparate-Treatment Theory

For those claims falling under a disparate-treatment theory, Plaintiffs will need to show that a reasonable officer would know, based on clearly established law, that "an adverse employment action" had occurred "*because* of [plaintiffs'] protected status."  *Olivarez v. T-*

16

*Mobile USA, Inc.*, 997 F.3d 595, 599–600 (5th Cir. 2021) (quoting *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019)).  "[A]dverse employment actions consist of 'ultimate employment decisions' such as hiring, firing, demoting, promoting, granting leave, and compensating . . . . [A]ction that 'does not affect job duties, compensation, or benefits' is not an adverse employment action."  *Thompson v. City of Waco*, 764 F.3d 500, 503 (5th Cir. 2014) (quoting *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281–82 (5th Cir. 2004)).

> b.      Hostile Work Environment

It is not clear whether Plaintiffs also assert a hostile-work-environment claim, but those terms are use in Plaintiff Adams's sworn statement.  Adams Statements [1-11] at 13–15.  If such claims are intended, then they will need to be explained.  *See EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007) (listing essential elements).

> 3.      Collective Pleading

Finally, as to the discrimination claims in general, the Complaint and attached exhibits discuss fact-specific discrimination claims asserted by various Plaintiffs.  Some Plaintiffs claim the same conduct, but most support their discrimination claims with their own distinct facts.  Here again, collective pleading will not suffice.  Plaintiffs will need to explain the claims in terms of which Plaintiffs assert which specific claims, against which Defendants, on what factual basis, and show why the alleged acts violate clearly established law.

The Court recognizes that this is a tall task and will give Plaintiffs time to complete it, but the fact that Plaintiffs chose to join their claims in a single suit does not diminish their individual burdens to defend those claims against qualified immunity, which is itself context-specific.  *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (noting that qualified-immunity inquiry "must be undertaken in light of the specific context of the case" (quoting *Brosseau*, 543 U.S. at 198)).

D.      Miscellaneous Claims

Plaintiffs offer a host of other grievances in their Complaint and attached affidavits.  For example, Plaintiffs frequently complain about things like nepotism, budget shortfalls, and mismanagement of government funds.  If those allegations were intended to state a federal cause of action, Plaintiffs will need to explain the legal theory and the clearly established law the Individual Defendants allegedly violated as to those issues.  Finally, Plaintiffs may have intended other federal claims that this Order did not include.  If so, they should be identified and addressed in like manner, demonstrating why qualified immunity should not apply.

IV.     State-Law Claims

Individual Defendants asked the Court to dismiss the state-law claims against them, but their opening memorandum did not say why.  In reply, Individual Defendants asserted that the claims are barred by the Mississippi Tort Claims Act.  *See* Defs.' Reply [27] at 5–6.  But "[i]t is the practice of . . . the district courts [in the Fifth Circuit] to refuse to consider arguments raised for the first time in reply briefs."  *Gillaspy v. Dall. Indep. Sch. Dist.*, 278 F. App'x 307, 315 (5th Cir. 2008).  This case shows why; Plaintiffs received no notice of the arguments against them and understandably offered no response.  The Court needs briefing from both sides, so the motion to dismiss is denied without prejudice as to the state-law claims.

V.      Joint Motion to Sever

All Defendants bring a motion to sever.  Mot. [18].  They argue that Plaintiffs were misjoined under Federal Rule of Civil Procedure 20, and, so, this suit should be fractured into separate lawsuits under Federal Rule of Civil Procedure 21.  Defs.' Mem. [19] at 4.  Specifically, Defendants say Plaintiffs' allegations "occurred at different times, between different

management, regarding various personnel decisions," and so a single lawsuit capturing all claims risks prejudicing them and unnecessarily wastes the court's time and resources. *Id.* at 3.

"Under Rules 20 and 21, the district court has wide discretion to sever an action if it is misjoined or might otherwise cause delay or prejudice." *Applewhite v. Reichhold Chems., Inc.*, 67 F.3d 571, 574 (5th Cir. 1995). In determining whether to sever an action, the Court considers five factors:

> (1) [w]hether the claims arise out of the same transaction or occurrence; (2) whether the claims present some common questions of law or fact; (3) whether settlement of the claims or judicial economy would be facilitated; (4) whether prejudice would be avoided if severance were granted; and (5) whether different witnesses and documentary proof are required for the separate claims.

*In re Rolls Royce Corp.*, 775 F.3d 671, 680 n.40 (5th Cir. 2014).

Defendants are correct that Plaintiffs' Complaint contains a complex web of factual allegations and differing questions of law and fact. This Order demonstrates the difficulties that can cause. At this point, the City of Jackson has not yet filed a motion to dismiss, and the Court is not prepared to address Individual Defendants' motion to dismiss. Accordingly, we do not yet know which federal claims will survive the initial pleading stage. Once that is known, there may also be issues of subject-matter jurisdiction to resolve. While it presently appears that some claims might be properly joined, it makes more sense to revisit the issue after the Rule 12 stage when it will be easier to determine whether the remaining claims should be joined. The Court denies the Defendants' Motion to Sever [18] without prejudice.

VI.     Conclusion

The Court has considered all arguments. Those not addressed would not have changed the outcome. For the foregoing reasons, Individual Defendants' motion to dismiss [20] is granted to the extent it seeks continuation of the stay but is otherwise denied without prejudice.

Defendants' motion to sever [18] is denied without prejudice.  Plaintiffs shall file their *Schultea*

response no later than October 29, 2021.[10]

        **SO ORDERED AND ADJUDGED** this the 29th day of September, 2021.

                            s/ *Daniel P. Jordan III*
                            CHIEF UNITED STATES DISTRICT JUDGE

---

[10] The Court notes that if it were to grant the Individual Defendants' motion to dismiss, it would do so without prejudice, as, while "a court may dismiss [a] claim, it should not do so without granting leave to amend, unless the defect is simply incurable or the plaintiff has failed to plead with particularity after being afforded repeated opportunities to do so."  *Hart v. Bayer Corp.*, 199 F.3d 293, 248 n.6 (5th Cir. 2000).  Employing the *Schultea* reply here allows the Court to resolve the immunity issues at the "earliest possible stage of litigation."  *Randle v. Lockwood*, 666 F. App'x 333, 336 (5th Cir. 2016) (quoting *Porter v. Epps*, 659 F.3d 440, 445 (5th Cir. 2011)).